*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0305p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DELMA AMBURGEY, Individually, as
Administratrix of the Estate of Jerry Michael
Amburgey, and as next Friend of J.A., a
minor,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA; MOUNTAIN
COMPREHENSIVE HEALTH CORPORATION, and
MAHMOOD ALAM, M.D.,

*Defendants-Appellees*.

No. 12-6279

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 7:11-cv-00132—Karen K. Caldwell, District Judge.

Argued: June 19, 2013

Decided and Filed:  October 24, 2013

Before:  GILMAN, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Stephen M. O'Brien III, STEPHEN M. O'BRIEN III, PLLC, Lexington, Kentucky, for Appellant.  Callie R. Owen, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellees.  **ON BRIEF:** Stephen M. O'Brien III, STEPHEN M. O'BRIEN III, PLLC, Lexington, Kentucky, for Appellant.  Charles P. Wisdom, Jr., Charlton S. Shier IV, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellees.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  On January 21, 2009, Jerry Michael Amburgey (Jerry) sought treatment for his persistent pneumonia from Dr. Mahmood Alam at a clinic run by Mountain Comprehensive Health Corporation (MCHC) in Whitesburg, Kentucky.  Jerry died that same day from a severe allergic reaction to an intravenous contrast dye that was administered to him in preparation for a CT scan.  His wife, Delma Amburgey (Delma), later sued Dr. Alam, MCHC, and—because MCHC is an agency of the federal government—the United States.

The sole issue on appeal is whether Delma timely filed an administrative claim with the U.S. Department of Health and Human Services (HHS), the answer to which determines the viability of her wrongful-death suit against the United States.  *See* 28 U.S.C. § 2401(b) (barring tort claims against the United States unless the claim is received in writing by the appropriate federal agency within two years of the claim's accrual).  Ruling on the government's motion to dismiss, the district court held that Delma's administrative filing was untimely.  It therefore dismissed the Complaint for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.      Factual background

Jerry saw a pulmonary specialist in late December 2008 after months of battling pneumonia.  The specialist recommended doing a lung biopsy, which first required a medical-clearance stress test.  During that test, Jerry was thought to have some type of coronary blockage, so he was sent to the Pikeville Medical Center for a cardiac catheterization.  He was given an intravenous contrast dye in preparation for that procedure, but the dye triggered a severe allergic reaction that nearly killed him.  His

medical chart was then updated with the information concerning his allergy and sent by facsimile to MCHC's Whitesburg clinic.

Despite Jerry's medical chart having been flagged with the allergy information, he was again administered intravenous contrast dye on January 21, 2009 in preparation for a CT scan, this time at Dr. Alam's direction. Jerry once again had a severe allergic reaction. He was rushed to the emergency room at the nearby Whitesburg Appalachian Regional Hospital, where he died soon after his arrival.

Following Jerry's death, Dr. Alam told Delma and other family members that Jerry had died of natural causes as a result of aspirating a blood clot that was associated with what Dr. Alam suspected was lung cancer. He also told the family that no autopsy would be necessary.

Meanwhile, Wallace Bolling, the Letcher County coroner, arrived at the hospital after learning of Jerry's death. He spoke with members of Letcher County's Emergency Medical Service (EMS) who had transported Jerry from MCHC's clinic to the emergency room. They told Bolling that they had been able to intubate Jerry but could not resuscitate him. The coroner then met with the Amburgey family in the emergency room, who related to him Dr. Alam's explanation for Jerry's death and the doctor's comment that no autopsy was necessary. Bolling then told the family that the cause of death that Dr. Alam had described to them—aspirating a blood clot—conflicted with information that he had received from the EMS personnel. Because of this conflict, Bolling ordered that an autopsy be performed. The autopsy report, issued on April 7, 2009 and given to Delma soon thereafter, listed the cause of death as an allergic reaction to the intravenous contrast dye administered to Jerry on January 21, 2009.

**B.     Procedural background**

On January 20, 2011, one day before the second anniversary of Jerry's death, Delma mailed the required form for asserting a wrongful-death claim against the government to MCHC. MCHC received the form four days later and in turn forwarded it to HHS, the latter being the appropriate federal agency for notification purposes under

the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2401(b).  *See* 28 C.F.R. § 14.2(b)(1) (requiring federal agencies to transfer claims to the proper agency for adjudication). Because the form was received by HHS more than two years after the date of Jerry's death, the government denied Delma's claim as untimely.  Her administrative appeal was likewise denied, and this lawsuit followed.

The government moved to dismiss Delma's tort claim for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  It argued, and the district court agreed, that Delma's claim accrued on the date of Jerry's death and that she failed to present her claim to the appropriate federal agency (HHS) within two years of the claim's accrual. *See* 28 U.S.C. § 2401(b); 28 C.F.R. § 14.2(a) (providing that a claim is deemed "presented" to a federal agency when the proper claim form or other written notification is received by the agency).  The court granted the government's motion and dismissed the Complaint.  Delma timely appealed.

## II.  ANALYSIS

### A.    Standard of review

"We review de novo a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) . . . ." *McCormick v. Miami Univ.*, 693 F.3d 654, 658 (6th Cir. 2012).  A challenge to subject-matter jurisdiction under Rule 12(b)(1) is either a "facial attack," where the  court must take all of the allegations in the complaint as true, or a "factual attack," where the court can "weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction." *Id.* (internal quotation marks omitted).  In the latter circumstance, we review the district court's factual findings under the clear-error standard. *Lovely v. United States*, 570 F.3d 778, 782 (6th Cir. 2009).  But "[e]ven when the parties raise a 'factual' challenge by submitting exhibits relating to subject-matter jurisdiction, we give deference to the district court only to the extent the district court actually made factual findings." *Id.*

In the present case, the district court assumed the facts in the Complaint to be true and apparently made the same assumption with respect to the facts set forth in

affidavits supporting Delma's claim and in her response to the government's Motion to Dismiss. *Amburgey v. United States*, No. 7:11–132–KKC, 2012 WL 4602438, at *3 (E.D. Ky. Sept. 29, 2012). The court did not make any separate factual findings. We will therefore review de novo the district court's application of the law to those assumed facts.

**B.     Claim accrual under 28 U.S.C. § 2401(b)**

The FTCA bars a tort claim against the United States unless first presented to the appropriate federal agency "within two years after such claim accrues." *United States v. Kubrick*, 444 U.S. 111, 113 (1979) (quoting 28 U.S.C. § 2401(b)). Although the FTCA does not define when a claim "accrues," the Supreme Court has held that a plaintiff's medical-malpractice claim accrues when he "knows both the existence and the cause of his injury." *Id. Kubrick* thus established an "inquiry-notice rule" rather than a "discovery rule (in the sense of discovering the existence of a claim)." *Hertz v. United States*, 560 F.3d 616, 618 (6th Cir. 2009). To avoid confusion, we note that some of our sister circuits have described *Kubrick* as establishing a "discovery rule," but they use the term "discovery" in the same sense that this court uses the term "inquiry-notice," *i.e.*, discovering the injury and its cause. *See, e.g.*, *In re Swine Flu Prods. Liab. Litig.*, 764 F.2d 637, 639–40 (9th Cir. 1985) (describing *Kubrick*'s accrual analysis as a "discovery rule" and contrasting it with the traditional tort rule of accrual at the time of injury).

Typically, a tort claim accrues under 28 U.S.C. § 2401(b) "at the time of the plaintiff's injury." *Kubrick*, 444 U.S. at 120. This court has recognized, however, that in "medical-malpractice cases in which the plaintiff has little reason to suspect anything other than natural causes for his injury, a plaintiff might need to know, or have reason to know, of doctor-caused harm (though not necessarily *negligently* doctor-caused harm) in order for his claim to accrue." *Hertz*, 560 F.3d at 619 (emphasis in original). In other words, many plaintiffs will know "enough of the critical facts of injury and causation to protect [themselves] by seeking legal advice" at the time of injury, *id.* at 618 (internal quotation marks omitted), but other plaintiffs, particularly in the medical-malpractice

context, will not know enough about the cause of injury to be on inquiry notice of a possible tort claim until long after the injury, *see id.*

A comparison of the tort claim at issue in *Hertz* with that in *Kubrick* clarifies this point. In *Hertz*, the plaintiff's wrongful-death tort claim was held to accrue at the time of her husband's death in an airplane crash. Because "[p]lane crashes by their nature typically involve negligence *somewhere* in the causal chain[,] . . . the mere fact of the event" was deemed sufficient to trigger the plaintiff's duty to inquire further about the crash and to seek legal advice. *Id.* at 619 (emphasis in the original).

The plaintiff's claim in *Kubrick*, however, was determined not to accrue until more than eight months after his injury. 444 U.S. at 113, 120 (noting that the plaintiff's injury occurred in April 1968, but that he did not become aware of the cause of his injury until January 1969). His injury, a hearing loss that occurred six weeks after surgery on his infected right femur, *id.* at 113–14, did not by itself suggest a cause. But once a doctor informed the plaintiff "that it was highly possible that the hearing loss was the result of the neomycin treatment" that he had received after his femur surgery, *id.* at 114, he was then found to be armed with sufficient information for his claim to accrue, *id.* at 120-22.

The claims in both *Hertz* and *Kubrick* were thus held to accrue when the plaintiffs knew enough about the causes of their respective injuries to put them on inquiry notice of a possible legal claim. These two decisions applied the same accrual rule; the difference between them was the timing of when the plaintiffs were found to have the requisite knowledge to trigger the accrual of their claims. As this court noted in *Hertz*, "[t]he determination as to when a plaintiff has such knowledge is necessarily fact-intensive." 560 F.3d at 619 (emphasis omitted).

Although both Delma and the government advance their respective arguments under the rule established in *Kubrick*, the government simultaneously argues that "FTCA wrongful death claims accrue on the date of death" irrespective of the plaintiff's knowledge about the cause of death. The government cites two Sixth Circuit decisions

in support of its position: *Kington v. United States*, 396 F.2d 9 (6th Cir. 1968), and *Garrett v. United States*, 640 F.2d 24 (6th Cir. 1981).

We find both cases distinguishable. Although this court's decision in *Kington* in fact established a date-of-death rule of accrual for wrongful-death claims under the FTCA, *see* 396 F.2d at 12, that decision preceded *Kubrick*, which is the Supreme Court's "leading precedent concerning accrual of claims for purposes of § 2401(b)," *Hertz*, 560 F.3d at 618. And although the per curiam decision in *Garrett* held that the plaintiff's wrongful-death claim accrued on the date of death, the decision cites to both *Kington* and *Kubrick* without specifying which analysis—*Kubrick*'s inquiry-notice rule or *Kington*'s categorical rule—the court was applying. *See* 640 F.2d at 26.

Moreover, subsequent decisions from both this court and our sister circuits have clarified that the *Kubrick* rule for claim accrual applies in the wrongful-death context. *See Hertz*, 560 F.3d at 618–19 (applying *Kubrick* when assessing accrual of a wrongful-death claim and not acknowledging any alternative rule to *Kubrick* in the wrongful-death context); *see also Skwira v. United States*, 344 F.3d 64, 75 (1st Cir. 2003) (employing the *Kubrick* analysis for accrual of a wrongful-death claim); *Garza v. U.S. Bureau of Prisons*, 284 F.3d 930, 934–35 (8th Cir. 2002) (same); *Diaz v. United States*, 165 F.3d 1337, 1340 (11th Cir. 1999) (same); *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 743 (4th Cir. 1990) (same); *In re Swine Flu Prods. Liab. Litig.*, 764 F.2d 637, 640 (9th Cir. 1985) (same); *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985) (same); *Barrett v. United States*, 689 F.2d 324, 327–28 (2d Cir. 1982) (same). We therefore reject the government's contention that a wrongful-death claim automatically accrues on the date of death, and we instead apply the *Kubrick* standard. *See Chomic v. United States*, 377 F.3d 607, 616 (6th Cir. 2004) ("[A] claim for wrongful death under the FTCA accrues on the date when both an injury and its cause are known.").

**C.     Delma's claim did not accrue until after the autopsy report issued**

The parties agree that the first part of the *Kubrick* rule—the plaintiff's knowledge of the injury—was satisfied on January 21, 2009, the date of Jerry's death. But they disagree as to whether Delma knew enough on that date about the cause of Jerry's death

for her claim to accrue.  Delma argues that she lacked sufficient knowledge about the cause of death until she received the autopsy report in April 2009, whereas the government contends that Delma overstates the level of knowledge required for her claim to accrue and that the correct date of accrual was instead the date of Jerry's death.

We agree with the government's contention to the extent that Delma did not need to know for certain what was the cause of Jerry's death before her claim accrued, or even that the conduct attributable to the government was more likely than not the cause.  *See Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir. 1986) ("The putative plaintiff need not know that the suspicious event is more likely than not the cause.  He may need discovery to determine the most likely cause . . . .").  Rather, her claim accrued when "a reasonable person would know enough to prompt a deeper inquiry into a potential cause" of Jerry's death that is tied to a government actor.  *See id.* at 632.

Analyzing this question in the medical-malpractice context, the Fourth Circuit explained in a decision cited by the district court below that, for accrual purposes, the "cause" of an injury does not refer to the "precise medical reason for the injury." *Kerstetter v. United States*, 57 F.3d 362, 364 (4th Cir. 1995) (emphasis omitted). Knowledge that an injury was a result of medical treatment generally, as opposed to knowledge of the specific injurious action or omission by the physician, is sufficient for a claim to accrue.  *See id.* at 364–65; *see also Nemmers*, 795 F.2d at 632 (noting that "actual or imputed" knowledge that the injury was caused by a physician's acts or "oversight" will typically trigger the accrual of the claim).

The upshot of *Kerstetter* and *Nemmers* is that claim accrual does not depend on a plaintiff's knowledge of what precisely the government actor did to cause the injury or that the government actor's conduct was more likely than not the cause of the injury. Accrual of the claims in both cases, however, did depend on the existence of circumstances that would alert a reasonable person to the possibility of physician-caused harm.  *See Kerstetter*, 57 F.3d at 363, 366 (holding that the plaintiffs' tort claim based on a surgery to remove a mass from their daughter's abdomen accrued when they learned that their daughter's kidneys would not resume functioning, because at that point they

also knew that her kidneys functioned normally prior to the surgery, and they had been told that her kidneys had "shut down" during the surgery); *Nemmers*, 795 F.2d at 632 (noting that "[a] medical report stating that there is a significant chance that an event caused an injury" is sufficient for a tort claim based on that event to accrue).

The government argues that the facts known to Delma on the date of Jerry's death were sufficient to prompt a reasonable person to draw a causal link between his death and the treatment that he received from Dr. Alam. According to the government, the following information alone was enough for Delma's claim to accrue: "Amburgey knew that her husband went to MCHC for a routine procedure and, shortly thereafter, was taken to the hospital and died." The problem with this argument is that it lacks any factual support in the record. Nowhere in the Complaint or the affidavits is there any suggestion that Jerry saw Dr. Alam for a "routine procedure." Without a proper factual basis, this argument must fail. The argument would hold greater sway had Jerry been in good health and was visiting his doctor for a regular check-up, but that is not the record before us.

Next, both the government and the district court point out Delma's purported knowledge that Jerry had nearly died a month earlier from a "similar test procedure." *Amburgey v. United States*, No. 7:11–132–KKC, 2012 WL 4602438, at *3 (E.D. Ky. Sept. 29, 2012). This assertion likewise has no factual support in the record. No proof is cited for (1) the proposition that a CT scan and a cardiac catheterization are similar test procedures, or (2) the proposition that Delma knew, or that a reasonable layperson would know, that such procedures are similar. The record, moreover, does not indicate that Delma even knew that Jerry was to undergo a CT scan on the day that he died.

Nor does the government cite anything in the record to show that Delma knew that MCHC had been warned about Jerry's life-threatening allergic reaction in December 2008. And even if this fact were in the record, such knowledge would presumably have given Delma even *less* reason to believe that a similar allergic reaction was the cause of death because a reasonable person would assume that the MCHC doctors would heed the warning that appeared in Jerry's medical file. *See McDonald v. United States*, 843 F.2d

247, 249 (6th Cir. 1988) ("[T]he patient has a right to place trust and confidence in his physician." (internal quotation marks omitted)).

The government is thus left with only two facts that arguably support its position: (1) the EMS personnel provided Bolling, the coroner, with information that Bolling determined was in conflict with what the Amburgey family reportedly heard from Dr. Alam; and (2) because of that conflict, Bolling ordered that an autopsy be performed. Comparing these facts to those in cases that were deemed sufficient to trigger the accrual of tort claims, however, leads us to conclude that Delma's wrongful-death claim did not accrue on the date of Jerry's death.

But before turning to the facts of these other FTCA-accrual cases, we first note that "[p]atients may reasonably rely on assurances by physicians" with respect to injuries and their causes. *Id.* at 248 (internal quotation marks omitted). This principle is applicable in the present case, where Dr. Alam told Delma that Jerry had died of natural causes. Nothing preceding the coroner's autopsy report contradicted Dr. Alam's assertion that the cause of death was natural. To be sure, the EMS personnel indicated to Bolling that they had been able to intubate Jerry, a fact that Bolling determined was in conflict with Dr. Alam's explanation that Jerry had aspirated a blood clot. But neither Bolling nor anyone else indicated to Delma that they had any suspicion that Jerry's death was related to the medical treatment he had received.

Bearing in mind these particular facts from the present case, we conclude that each case that the government cites in support of its argument that Delma's claim accrued on the date of Jerry's death is distinguishable. One such case is *Arvayo v. United States*, 766 F.2d 1416 (10th Cir. 1985), where the plaintiffs' infant son, Jose, suffered significant brain damage from bacterial meningitis, which had initially been misdiagnosed as an upper respiratory infection. *Id.* at 1417–18. Had the condition been properly diagnosed from the start, "Jose probably would not have suffered the severely disabling injuries." *Id.* at 1418. The Tenth Circuit concluded that a reasonable person in the plaintiffs's position, knowing "of two drastically different diagnoses in a twenty-four hour period" and that Jose had suffered significant brain damage from the

meningitis, would have inquired into the propriety of the initial diagnosis and its potential contribution to Jose's condition. *Id.* at 1418, 1422–23.

Delma, in contrast, received only one explanation for Jerry's death—Dr. Alam's statement that Jerry had died of natural causes. Bolling at the time did not suggest an alternative cause of death, nor did he even say that Dr. Alam's explanation was wrong. Instead, he said only that he was ordering an autopsy because of conflicting information that he had received from the EMS personnel. That statement is a far cry from receiving "two drastically different diagnoses." *See id.* at 1422.

The Second Circuit's decision in *Castillo v. United States*, 656 F.3d 135 (2d Cir. 2011), also cited by the government, is likewise distinguishable. In that case, the plaintiff's claim was determined to accrue when she was put on inquiry notice of a possible claim at the point that an "early intervention counselor raised the possibility of medical malpractice and encouraged her to seek legal advice" with respect to her infant daughter's injury. *Id.* at 140–41; *see also Johnson v. United States*, 460 F.3d 616, 622 (5th Cir. 2006) (holding that the plaintiff's claim accrued when her infant was diagnosed with cerebral palsy and she was told about the possible connection between that condition and problems associated with the infant's birth). The present record indicates that no comparable suggestion was made to Delma on the date of Jerry's death, or even that his demise was potentially the result of medical treatment.

Nor do the two cases from the Eleventh Circuit cited by the government support its accrual argument. The plaintiff in *Price v. United States*, 775 F.2d 1491 (11th Cir. 1985), "was told within days of her operation in September 1980 that she lost a fetus as the result of the hysterectomy." *Id.* at 1494. "She also knew that the doctor who performed the hysterctomy relied on information that she was not pregnant, and that this information was incorrect." *Id.* At that point, "she had to know that her injury was probably connected to some act of those responsible for her treatment." *Id.* Once again, the government can point to no comparable circumstances in the present case. Delma was not told that Jerry had been administered an intravenous contrast dye on the day that

he died or anything else to suggest that his death was the result of medical treatment rather than natural causes.

With regard to the second case from the Eleventh Circuit cited by the government, *Chasteen v. United States*, 334 F. App'x 271 (11th Cir. 2009), the facts appear more apposite at first blush, but on closer examination are plainly distinguishable. The plaintiff in *Chasteen* argued, much like Delma, that the wrongful-death claim did not accrue until an autopsy report was completed, while the government contended that the claim accrued on the date of death. Although the court agreed with the government, it highlighted a key fact that distinguishes the facts of *Chasteen* from the present case: The decedent's husband knew that his wife's "diabetes was poorly controlled under [Dr. Ham-Ying's] care," and the husband "immediately made a connection between Dr. Ham-Ying's treatment and [his wife's] death." *Id.* at 274. Indeed, his suspicion that her death was physician-caused was his motivation for requesting an autopsy report. *Id.* Delma, in contrast, had no suspicion that Jerry's death was connected to his medical treatment prior to learning from the autopsy report that his death was caused by an allergic reaction to intravenous contrast dye. Nor would a reasonable person in Delma's position likely have such a suspicion, especially where the treating physician assures her that the death was due to natural causes.

In sum, the government has not identified a single case in which a court has held that the *Kubrick* rule for claim accrual was met on such limited information as Delma had when Jerry died. The present case instead falls more closely in line with cases in which the injured plaintiffs had not been told on the relevant date that their injuries were potentially caused by medical treatment, and the courts have held that their claims were not time barred. *See, e.g.*, *Winter v. United States*, 244 F.3d 1088, 1091 (9th Cir. 2001) (holding that the plaintiff's claim had not accrued when, in contrast to *Kubrick*, "[a]t no point did any doctor tell Steven Winter that the electrodes implanted by Dr. Marsolais caused, or might have caused, his cellulitis"); *McDonald v. United States*, 843 F.2d 247, 249 (6th Cir. 1988) (holding that a patient's "blameless ignorance" with respect to his injuries prevented the statute of limitations from running and remanding for factfinding

regarding assurances that doctors made to the plaintiff about his surgery having no complications).

We therefore conclude that, based on the current record, Delma's claim did not accrue until after she had received the autopsy report in April 2009. Because the government received her administrative claim well within two years of that date, Delma's tort claim is not barred by 28 U.S.C. § 2401(b).

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.